# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SHARY POWELL,

        Plaintiff,

v.                                            No. CIV 01-1380 LH/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

Plaintiff Shary Powell ("Powell") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Powell was not eligible for disability insurance benefits ("DIB"). Powell moves this Court for an order reversing the administrative agency's decision[2] or remanding for a rehearing.  [Doc. 9.]

Powell was born on October 19, 1960 and was 39 years old when the administrative hearing was held.  She has a high school education.  [Tr. at 13, 25.]  She last worked as a cosmetologist in

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2] While the Motion actually asks for a review of the decision of the Appeals Council, issued October 9, 2001, the ALJ's decision is the appropriate final decision subject to judicial review.  20 C.F.R. § 404.981.

March 1993, at which point she alleges she was forced to quit due to severe physical and mental limitations related to a diagnosis of Multiple Sclerosis ("MS"). [Doc. 10.] She is married and lives with her husband and two girls, ages 11 and 12. [Tr. at 25.]

On January 27, 1999, Powell applied for disability benefits, alleging an onset date of March 12, 1993, due to MS. [Tr. at 13, 57.] Powell's application for disability benefits was denied at the initial and reconsideration stages, and she sought timely review from the ALJ. An administrative hearing was held on February 7, 2000. In a decision dated March 13, 2000, the ALJ found that Powell was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request. Powell challenged this determination to the Appeals Council which denied her request for review on October 9, 2001. [Tr. at 3.] This appeal followed.

Key to the inquiry in this case is the March 31, 1996 expiration of Powell's insured status for social security benefits. [Doc. 10, p. 8; Tr. at 53, 60, 72.] To qualify for disability benefits, the claimants must meet the insured status requirements and be under a "disability" during that time. More specifically, 42 U.S.C. § 423(d) requires that the claimant be unable to engage in any substantial gainful activity by reason of physical or mental impairment which lasted or could be expected to last for a continuous period of not less than 12 months. Therefore, the time period at issue is the date of onset, March 12, 1993 until March 31, 1996, and the ALJ was required to determine whether Powell was under a disability during that period, in contrast to whether she might be considered currently disabled. *See* Potter v. Sec'y of HHS, 905 F.2d 1346, 1348-49 (10th Cir. 1990).

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is capable of performing other work.[10]   If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).   For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy.   Id. at 669-670.   Before applying the grids, the ALJ must first find the following:  "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category."   Id. at 669 (relying on Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).   Non-exertional limitations can include mental impairments.   The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable.   Id.   However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work."   Id. (internal citations omitted.)   In this case, the ALJ conclusively used the grids in reaching her decision at step five of the analysis and did not utilize a vocational expert.

---

[9]One's RFC is "what you can still do despite your limitations."   20 C.F.R. § 404.1545(a).   The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.   Those categories are: sedentary, light, medium, heavy and very heavy.   20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. <u>Glenn v. Shalala</u>, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. <u>Trimiar v. Sullivan</u>, 966 F.2d 1326, 1329 (10th Cir. 1992); <u>Muse v. Sullivan</u>, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. <u>Hamilton v. Secretary of Health & Human Servs.</u>, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. <u>Id.</u> at 1497-98. In <u>Clifton v. Chater</u>, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

<u>Clifton v. Chater</u>, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Powell's medical records, symptoms and complaints, the ALJ rejected her claim for benefits at step five, concluding that she was not precluded from performing a significant

number of sedentary jobs for a period of 12 continuous months between March 12, 1993 and March 31, 1996. [Tr. at 16-18.] In reaching this decision, Judge Carol Connor made the following findings before utilizing the Medical-Vocational Guidelines ("grids"): (1) Powell had not engaged in post-onset substantial gainful activity through the expiration of her insured status; (2) Powell's MS was a severe impairments, but did not meet or medically equal one of the listed impairments; (3) Powell's allegations regarding her limitations were not totally credible as to her claimed disability prior to March 31, 1996; (4) she is unable to perform any of her past relevant work; and (5) Powell had the RFC for a full range of sedentary work for the period of time under consideration. [Tr. at 17-18.] At the fifth step of the sequential analysis, the ALJ applied the grids, without any vocational expert testimony, and decided that the grids directed a conclusion that Powell was not disabled during the time period at issue based on an exertional capacity for sedentary work, along with her age, education and work experience. [Tr. at 17-18.] In reaching this conclusion, Judge Connor specifically discussed Social Security Rulings 83-10 and 83-11. Thus, the ALJ determined that Powell was not disabled since there were a significant number of sedentary jobs that Powell could perform from the date of onset through the expiration of her insured status. [Tr. at 16.]

### Summary of Powell's Medical History

Powell was first diagnosed with MS in 1993 but testified that her symptoms appeared in about 1991. She continued to work as a cosmetologist from 1991 to 1993, but quit due to her illness in 1993. [Tr. at 25.]

Powell's medical records are few in number. The first record is dated February 5, 1993. She was 32 years old when Dr. Don F. Seelinger saw her for a neurological assessment. [Tr. at 118, 138.] She stated that her first neurologic complaints occurred in 1991 and she described those complaints

to Dr. Seelinger as follows:  She was fishing wither her sister, apparently in 1991.  She was driving a Citation at the time and it hurt her left leg to push on the clutch.  "She then developed some numbness, a lack of feeling in the toes of both feet.  Over a period of days it spread up until it came to above the breast on either side.  It was an asleep electricity-type feeling.  There was an associated mild involvement at the fingertips.  She was frustrated and scared by this."

As of 1993, Powell denied bowel or bladder complaints to Dr. Seelinger, but Dr. Seelinger noted that she had some bladder hesitancy and could not empty her bladder well when she saw Dr. Freedman in 1991.  In 1993, Dr. Seelinger indicated that Powell was fatigued and felt weak but did not really have any limitation of function.  It did not affect her balance.  She had an MRI of the cervical thoracic cord and of the head [apparently in 1991], but the results of those were not available.  When she saw Dr. Freedman in 1991, there were some white matter abnormalities in the posterior parietal periventricular region.  "These were not dramatic."

The February 5, 1993 medical record reflects that "at the time of her difficulties from June to September 1992, she had a Lhermitte's sign."[12]  However, she was under stress with a number of life changes then.  They were remodeling their home, selling it, having trouble with the IRS and having difficulties with a neighbor.  Powell became sick at that time, was shaky and had some electricity-sensitivity type sensations.  [Doc. 118.]  On Feb. 5, 1993, Seelinger's impression was "no real limitations of function," although Powell had sensitivity.  "Sleeping and memory are normal."  All testing that day in the office was normal, including Powell's coordination, tone, strength, gait, Romberg, and cranial nerves.  [Tr. at 120.]  Powell was anxious to establish a diagnosis, and Dr.

---

[12]A Lhermitte's sign entails shock-like sensations suggestive of MS.  Touhy v. Sec'y of HHS, 34 F.3d 1068, 1994 WL 454880 at *1 (6th Cir. 1994).

Seelinger told her that he thought the most likely consideration was MS. He planned further testing and consultation with Powell. [Tr. at 119.]

On December 15, 1993, she was diagnosed with acute optic neuritis that later resolved. Her sense of colors were off, things were blurry, and she had trouble focusing. Her reading was at 20/400. [Tr. at 116-117, 136-137.] The record reflects, however, that "[t]hings have gone well." Nine months later, on August 2, 1994, Powell saw Dr. Seelinger again. She had recovered from the visual problem and denied any visual complaints.

As of August 1994, Powell reported some numbness and tingling from the calves down in the past and weakness with exposure to heat. [Tr. at 114, 116, 134.] No speech problems were present. She had some difficulties using buttons from time to time but had good grip and strength. She fatigued easily, dropped things frequently and had more trouble with her left than right arm. Although her balance was off, Powell reported no falls. She had some near misses. She had "occasional stress incontinence." Dr. Seelinger noted that "the Lhermitte's sign is gone now but she anticipates, I think correctly, that this will recur." [Tr. at 114.] Powell's spirits were better, but her thinking was slowed and she was occasionally forgetful. Her cranial nerve exam that day appeared normal. Her "posture holding" was normal. Her manual muscle testing showed 5/5 strength in all groups. However, she "swayed excessively on the Romberg."[13] As of this date, Powell had "well established MS" and well documented optic neuritis." Her spinal cord involvement in the past had essentially resolved. Her major complaints then were reduced endurance, fatigability, clumsiness with

---

[13]A Romberg test may demonstrate that the individual's postural position sense is affected when the patient cannot stand with feet together and eyes closed. Stedman's Medical Dictionary, 26th ed., p. 1347.

her hands and loss of balance.  Her strength was excellent.  Dr. Seelinger concluded that she was in "relative remission."

Based on the medical records, it appears that Powell did not see Seelinger until about 1 ½ years later.  On March 26, 1996, a few days before her insured status expired, Powell told Dr. Seelinger that things were going well.  [Tr. at 113.]  She had decided she did not want to be sick and wanted to be healthy.  She was staying at home being a mother and a wife "and feeling very good about that decision as she should."  [Tr. at 113.]  She had some limitations and periodically had numbness in her left arm and leg.  "She has had no major attacks" and her vision was 20/20.  She was to continue the Elavil[14] and see Dr. Seelinger in one year.  [Tr. at 113.]

On June 17, 1997, after the expiration of her insured status, it appears that Powell was having an attack of the MS.  Her subjective complaints as of that date included fatigue, exhaustion, dizziness, unsteadiness, lack of balance, and less enthusiasm about things, including sex.  [Tr. at 112, 133.]  She had a very negative reaction to Amantadine.[15]  They had tried to take her off Elavil as well, but she felt panicky after stopping it.  So, it was restarted for the moment.  Objective testing by Dr. Seelinger revealed no nystagmus.  "She did rapid alternating movements quite well."  She was very uncomfortable when Dr. Seelinger placed her head to the right.  Dr. Seelinger's impression was MS with a current attack with unstable gait, unsteadiness, dizziness and insecurity.  She was to stop the Elavil and start Zoloft.  [Tr. at 112.]

---

[14]Elavil is the brand name for Amitriptyline, which is sometimes prescribed for MS patients for painful sensory symptoms.  It also is used an anti-depressant and for sleep disorders.  Merck Manual, 17th ed., p. 1476; Stedman's Medical Dictionary, 26 ed., p. 61.

[15]Amantadine is an anti-viral agent that is used to treat Parkinsonism.  It increases the release of dopamine.  Stedman's Medical Dictionary, 26th ed.

On June 26, 1997, Powell visited the Emergency Room at Presbyterian Kaseman complaining of nausea and watery stools. The record indicates that she was diagnosed with MS in 1991 and that she had had a number of acute episodes of MS. She felt she was undergoing an acute episode at this time which had already lasted for about two months. She complained of electric-like shocks moving from her hips to legs and generalized aches and pains. She was taking Valium every night for sleep. She appeared "fairly markedly depressed-appearing." [Tr. at 107.] The physical exam showed decreased sensation in her feet an ankles and somewhat decreased hand grip, particularly on the right side. [Tr. at 107-08.] The physician concluded that she needed further work-up and that she should see a gastroenterologist. She was given a physician's referral information and advised to call the doctor on Monday. [Tr. at 108.] There is no medical record indicating that she followed up with a GI physician.

On July 21, 1997, Powell saw Dr. Seelinger related to her MS. [Tr. at 111.] Dr. Seelinger noted that since her last visit, "she has vastly improved." She still, however, had difficulties, particularly with the vision in her left eye. Movements were done less well on her left side. She had some elective distribution of weakness in the right leg, but her gait and station were "definitely improved." She swayed on the Romberg testing and fell towards the left. Dr. Seelinger's impression was that she had MS with "mild left sided weakness," more so in the leg than arm and that she had left optic neuritis. He asked her to see him in one month. She was taking Elavil. [Tr. at 111.]

On January 22, 1998, Powell was seen at the Emergency Room at Presbyterian Kaseman. She complained of vomiting and diarrhea that day which began after taking her first dose of Zoloft, an anti-depressant medication. [Tr. at 103.] The record notes that she was "positive for early MS." Doctor Gallegos observed that she was "slightly anxious." After several hours, she felt much better.

10

On January 22, 1999, Powell complained to Dr. Seelinger of dizziness for the past year, unpredictable "body jerks," and fatigue.  [Tr. at 110, 132.]  She reported bad reactions to Zoloft and Prozac.  She thought her vision had improved.  Objective observations by Dr. Seelinger were "mild levitation of the left arm," and that her left leg scuffed "just a bit" when she hurried.  Decreased associated movements were noted in the left leg.  However, "all in all, she is using her left arm and right arm quite well."  She "swayed excessively" on the Romberg testing.  She read 20/20 with the eye chart.  Dr. Seelinger's impression was that the MS was manifested primarily by fatigue and mild weakness in the left side, a bit more in the left leg than left arm.  The fatigue and lack of endurance were the persistent problems for her which is characteristic of MS.  [Tr. at 110.]

On about January 27, 1999, Powell applied for disability benefits.  [Tr. at 57.]  In her Disability Report, she stated that she was diagnosed with MS and experienced "extreme tingle, sleep sensation in legs, weakness in legs and arms,"dizziness causing falls, visual loss, fatigue depression, and speech complications.  [Tr. at 77.]  She indicated that her illness first bothered her on March 12, 1993, which is the last day she worked.  [Tr. at 77.]  In March 1999, she provided updated information to disability services that her ovulations symptoms had worsened, her legs "feel asleep and floppy."  She needed room to walk because she was not coordinated.  She could walk 5-10 minutes at time.  She fell and dropped things because her arms were not coordinated.  She could not pick things up with her left hand and became dizzy frequently.  She felt very depressed and she was stressed that she was so physically incapacitated as to be unable to care for herself.  She said she needed to avoid stressful environments and that she could not handle family and friends due to her physical limitations.  [Tr. at 86.]  Powell also needed assistance with showering and dressing.  She said that she had been in bed for three months at a time and was "essentially [] at home confined to

11

[her] bed or a chair, except for doctor appointments." [Tr. at 88.] Her medications in 1999 were Amitriptyline, Levoxyl (thyroid medication), Diazepam (nervousness, anxiety), Tylenol and Ibuprofen. [Tr. at 93.]

A functional capacity assessment was performed on about February 25, 1999. [Tr. at 121-128.] The primary diagnosis was MS. The form noted exertional limitations of occasional lifting of 20 pounds, frequent lifting of 10 pounds, ability to stand, sit, or walk for about 6 hours in an 8 hour work day, and limited ability to push and pull with her upper and lower extremities. [Tr. at 122.] The record further indicates that Powell had early MS at the "date of last insured" of March 1996 and minimal levitation of the left arm. She suffered from periodical numbness on the left side. Her gait and station "were normal" and her vision was 20/20 bilaterally. [Tr. at 122.] She had no visual limitations then. No other limitations were noted. [Tr. at 124.]

In the record, there is also a "Statement of Ability to Do Work-Related Physical Activities," signed by Dr. Seelinger on February 25, 1999. The form asks that the physician provide a statement of the patient's impairment-related physical limitations "as of 3/31/96."[16] [Tr. at 130.] Dr. Seelinger checked off the following limitations based on Powell's weakness and fatigue due to MS: occasional lifting of less than 10 pounds, frequent lifting of less than 10 pounds, ability to stand or walk for less than 2 hours, ability to sit less than 6 hours per 8 hour work day, limited ability in the upper extremities to push and pull. [Tr. at 130.]

The June 14, 1999 medical record indicated that Powell was not working and had not worked since 1993. She reported to Dr. Seelinger that she was worse in a number of ways, her balance was

---

[16]It is not clear whether Dr. Seelinger was considering Powell's condition "as of 3/31/96" as the form indicates or whether he was providing information based on her present condition. The phrase "as of 3/31/96" is not prominently displayed on the form.

"awful," she could not get around at all, she was unsteady, unstable and lurched, she got abrupt jerky movements in her leg and tended to drop things. [Tr. at 131.] She felt "wired" on Zoloft and Prozac and they gave her a degree of overreaction and excitability that were unacceptable to her. She was having a terrible time with incontinence and had accidents. She was depressed and taking Amitriptyline which she was tolerating and had improved her sleep. [Tr. at 131.] Dr. Seelinger's objective impression were that she had increased reflexes, bilateral upgoing toes, no nystagmus. Her gait was wide based, unstable and she had a positive Romberg. Her MS was manifested by poor balance, falling, dropping things and urinary incontinence. "All of this is, given her young age, very depression." She had not tolerated some of the antidepressants she had tried. She probably was a candidate to be one of the injectable immunologic modulating agents. She gave Dr. Seelinger disability forms to fill out which planned to complete. [Tr. at 131.]

On August 25, 1999, Dr. James Tryon filled out a disability form entitled "Statement of Ability to Do Work-Related Mental Activities" "as of 3/31/96."[17] [Tr. at 141.] The form was slightly different than that completed previously by Dr. Seelinger. It appears that Dr. Tryon did not check off any of the available boxes indicating limitations. Instead, he provided the following handwritten notations: "MS is cyclical regarding its symptom pattern. In quiescent periods, patient is 'normal.' During attacks, patient cannot function routinely." [Tr. at 141.] "During attacks, patient's concentration and persistence are clearly impaired. The episodes of symptom occurrence cannot be predicted." [Tr. at 141.] "[Social] Interactions are appropriate when not symptomatic. When symptoms occur there are behavioral disturbances." [Tr. at 142.] "Shary is normal during

---

[17]Again, it is unclear whether Dr. Tryon was evaluating Powell's condition as of the present date or as of 3/31/96. Dr. Tryon did not treat Powell until early 2000.

13

asymptomatic periods but becomes confused and quite limited in her ability to respond to situational changes when symptomatic."  [Id.]

In September 1999, Powell's mother, Shirley Harris, provided a typewritten statement on Powell's behalf.  Ms. Harris stated that in her observations, Powell's medical condition began after the birth of Powell's second daughter in 1989 and that she became aware of Powell's diagnosis of MS in 1989 after Powell told her mother of that diagnosis.  Most of Powell's mother's statements appear to reflect what Powell told her mother rather than her mother's actual observations of Powell. [Tr. at 94-95.]

Powell's father-in-law also provided a statement in support of Powell's benefit claim.  He stated that she had been very active and outgoing but that with MS, she became unpredictable, difficult to get along with, moody, very nervous and agitated.  [Tr. at 96.]  Mr. Powell had seen her bedridden for up to one week and observed her becoming dizzy and losing her equilibrium.  He was with Powell on one occasion when she suddenly was unable to see and needed assistance.  Mr. Powell also stated that he had observed Powell crying a lot and appearing depressed.  [Tr. at 97.]

In a 1999 disability form, Powell stated that her doctors (Dr. Tryon and Dr. Seelinger) told her that she was very unpredictable and that because of her unpredictability, she would not be able to handle any kind of work.  [Doc. 98.]   She further noted that she suffered from both mental and physical impairments.

On January 27, 2000, Dr. Tryon wrote a letter to "whom it may concern," stating that Powell was diagnosed with MS, and had a an onset in 1993 with a "classic presentation of optic neuritis." She then, "she has had a fairly typical course of waxing and waning symptoms.  During quiescent periods she is able to function normally.  Unfortunately, the periods of exacerbations can't be

predicted and when they occur, Ms. Powell experiences both mental and physical impairment. She becomes confused and limited in her ability to respond normally to situational changes." [Tr. at 143.] Upon reviewing the Listing of Impairments provided by the SSA, Dr. Tryon described 11.09(B) as most closely describing her clinical situation. Section 11.09(B) details mental impairments further characterized in 12.02, part A, which identifies (1) disorientation to time and (2) memory difficulty, as well as changes in mood and personality. "The unpredictable occurrence of symptoms have clearly resulted in the patient's having difficulty in maintaining social function . . . . I have observed these episodes in my clinic." [Tr. at 143.]

## Discussion

In this appeal, Powell asserts that the case must be reversed and remanded because: (1) the ALJ failed to develop the record regarding Powell's mental impairments of depression and anxiety; (2) Judge Connor erred in relying on the Grids, without the utilizing a vocational expert, because Powell had nonexertional impairments related to her MS and mental impairments; and (3) the ALJ erred in her credibility assessment and did not follow the provisions of SSR 96-7p. [Doc. 10.] The Commissioner claims the Commissioner's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. 11.]

This case is both difficult and unfortunate. Multiple Sclerosis is unquestionably a degenerative and debilitating disease, for which there is no cure. The disease is subject to periods of remission and

exacerbation.  Jones v. Sec'y of HHS, 35 F.3d 566, 1994 WL 468033 at *3 (6th Cir. Aug. 29, 1994).

Despite the seriousness of the disease, however, it is not a "per se" disability.[18]

Here, at some point in 1997, the medical records confirm that Powell was suffering an attack

of MS that may very well have been considered disabling.  However, that 1997 attack occurred after

the expiration of her insured status.  The fact that Powell suffered from some symptoms of MS prior

to the expiration of her insured status is not dispositive.  Rather, the key inquiry here is whether

Powell was disabled by her MS before her insured status expired.  See Grebenick v. Chater, 121 F.3d

1193, 1198-99 (8th Cir. 1997) (also discussing whether the claimant's MS was disabling prior to the

expiration of her insured status).  Powell's 1993-1996 medical records, do not support a finding that

she was unable to work during the period under review, i.e., March 1993 – March 1996.  Instead,

the records during that time frame indicate some problems with fatigue, balance, sensitivity and

numbness, but not significant and sustained disturbances.  See Grebenick, 121 F.3d at 1199.  Thus,

after a review of the entire record, this Court recommends, for the reasons set out below, that

Powell's motion be denied and that this case be dismissed, with prejudice.[19]

## I.    ALLEGED MENTAL IMPAIRMENTS

Powell makes three related arguments regarding her alleged mental impairments: (a) that the

ALJ's failure to find her mental impairments severe at step two of the analysis was erroneous; (b) that

---

[18]The disease also may meet Listing requirements (step 3 of the sequential evaluation process) when the claimant suffers from "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 11.04B, 11.09A.

[19]It is noteworthy that Plaintiff's counsel never directly argues that the ALJ erred with respect to any of his findings related to Powell's physical symptoms, nor does he contend that Powell met the Listing requirements for MS, during the pertinent time frame.  Powell's entire argument relates to alleged mental impairments and/or their effect on the ALJ's findings.

the ALJ should have called a medical consultant in accordance with SSR 85-28; and (c) the ALJ should have ordered a consultative examination.

### A.   Step Two: Severe Impairments

At step two, the decision maker decides whether the claimant "has a medically severe impairment or combination of impairments." Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988). "A severe impairment is one that interferes with basic work activities." Roberts v. Callahan, 971 F. Supp. 498, 500 (D.N.M. 1997). An impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, hearing, seeing, speaking, understanding, carrying out simple instructions, use of judgment, responding appropriately to supervision and co-workers, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(1-6). An impairment is not severe if it is only a slight abnormality with a minimal effect on the ability to work. Roberts, 971 F. Supp. at 500 (citing SSR 85-28).

> Presumptively, if the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, irrespective of vocational factors, the impairments do not prevent the claimant from engaging in a substantial gainful activity. If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, on the other hand, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.

Williams, 844 F.2d at 751 (citing Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 2291 (1987)).

Powell contends that Judge Connor erred in not finding her mental impairments severe at step 2 of the sequential process and in failing to consider the mental impairments through the remaining

steps of the evaluation process.  Powell argues that there was evidence that she suffered from depression and anxiety related to her diagnosis of MS prior to March 31, 1996.

The earliest medical record, dated February 5, 1993, does not reference any type of anti-depressant medication Powell might have been taking as of that date, nor does it discuss symptoms of depression.  She was sleeping well then.  The record notes that she was "anxious" to establish a diagnosis, and that she underwent a number of life changes that apparently caused her some stress in 1992. [Tr. at 118.] The next record, dated December 15, 1993, shows that she developed a visual problem in her left eye but that "things have gone well" other than that problem.  No depression or treatment for depression is reflected in this record. [Tr. at 117.] The August 2, 1994 medical record documents that she had been taking Amitriptyline and that she was "sleeping reasonably." [Tr. at 114.] "Her spirits are somewhat better." [Id.] Rather than depression or anxiety, Dr. Seelinger noted that "her major problems are lack of endurance and fatigability." [Tr. at 115.] She was in "relative remission" then.  On March 26, 1996, five days before the end of her insured status, the record notes that she is to continue with Elavil, that "things are going well," and she was "feeling very good" about her decision to stay at home being a mother and wife. [Tr. at 113.] There is no mention of depression in the record.

In addition to these records, Powell relies on several medical records documenting a subsequent visit to Dr. Seelinger, when her anti-depressant medication was addressed and changed. This June 1997 visit, however, occurred after the expiration of her insured status, when she apparently was suffering a current attack of MS. [Tr. at 112.] The record does not indicate or imply

18

that she was suffering from disabling depression or anxiety prior to the time her insurance expired.[20] [Tr. at 110, 112.]

Powell also cites Dr. Tryon's assessment performed in early 2000 when he first saw Powell. Dr. Tryon's comments in 2000 appear rather general in terms of what to expect with MS patients. He states generally that Powell would have problems with confusion, social interactions, etc. during symptomatic periods.  [Tr. at 142.]  A treating physician may provide a retrospective diagnosis of a claimant's condition.  Potter, 905 F.2d at 1348.  However, "[a] retrospective diagnosis without evidence of actual disability is insufficient.  This is especially true where the disease is progressive."  Id. at 1349.  As stated previously, MS, while clearly a disabling disease, is not a per se disability – at least, not at every stage of the disease.  Boniger v. Chater, 1996 WL 91880 at *2 (D. Kan. Feb. 15, 1996).  The critical inquiry remains whether the initial symptoms of the disease are disabling.  Id., 1996 WL 91880 at *2, fn. 3.  Here, Dr. Tryon's statements simply do not support a finding that Powell suffered from significant mental impairments for a continuous 12-month period between March 1993 and March 31, 1996.  Indeed, according to Dr. Seelinger, the MS was in relative remission when he saw her during that period.

In her decision, Judge Connor appropriately determined that she was unable to conclude that Powell had a significant mental or emotional problem during the period in review.  The ALJ carefully and thoroughly addressed the pertinent medical records in her opinion.  She noted that Powell had been prescribed Amitriptyline since the initial diagnosis of MS, although the records actually do not

---

[20]The Court recognizes that the ALJ was required to address Powell's evidence of alleged impairments arising after the date of the insured status and that the time period for Powell's SSI claim is not delimited by the expiration of her insured status.  Indeed, Judge Connor noted that she carefully reviewed all of the medical records after the expiration of Powell's insured status to see if they provided any clue to her RFC prior to that date.  [Tr. at 16.]  Nonetheless, the claimant still has the burden to show she was disabled prior to expiration of her insured status.  Henrie v. U.S. Dep't of HHS, 13 F.3d 359, 360 (10th Cir. 1993)

indicate that she was taking an anti-depressant as of 2/5/93 or earlier.  Judge Connor also considered

Powell's testimony at the hearing that she had suffered from depression and anxiety.  However, there

were no medical records or clinical findings documenting depression and anxiety during the period

under review.  The ALJ noted that Powell did not visit a psychologist or psychiatrist during that time,

and there were no indications in the medical records that she needed a psychological referral.  The

use of an anti-depressant, without more, is not evidence of a significant mental or emotional problem,

especially in this case where Powell's alleged depression or anxiety was not discussed in the medical

records and where it appears that Powell had only some problems due to her MS during the period

under review.  Powell failed to provide sufficient evidence of depression and anxiety to make the "*de

minimis*" showing of medical severity required to continue beyond step two of the sequential process.

*Compare* SSR 85-28 (an impairment is not severe if it is only a slight abnormality with a minimal

affect on the ability to work.)  Thus, under the facts of this case, substantial evidence supports the

ALJ's decision.

### B.   SSR 83-20 -- Medical Advisor

Powell argues that Judge Connor failed to adequately develop the record as to her alleged

mental impairments and that the ALJ should have called a medical advisor to testify at the hearing.

SSR 83-20.  The Social Security Ruling sets forth guidelines to determine the onset date of a

claimant's disability.  Grebenick, 121 F.3d at 1200.  Ruling 83-20 recognizes that it sometimes is

necessary to infer the onset date, or the "first day an individual is disabled . . . .," and that, in such

cases, a medical advisor should be called to testify at the hearing.  Reid v. Chater, 71 F.3d 372, 373

(10th Cir. 1995).  Relevant factors in determining the onset date of a disabling impairment are the

claimant's allegation of the onset date, her work history, and, in particular, the medical evidence.  Id.

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process . . . .

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the ALJ should call on the services of a medical advisor when onset must be inferred. . . . If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in [the] file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. . . . The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence in the record.

Grebenick, 121 F.3d at 1200 (*quoting* SSR 83-20).

However, a medical advisor need be called only where the medical evidence of the onset date is ambiguous.  Reid v. Chater, 71 F.3d at 374; Grebenick, 121 F.3d at 1201.  "[W]hen there is no contemporaneous medical documentation, we ask whether the evidence is ambiguous regarding the possibility that the onset of her disability occurred before the expiration of her insured status." Grebenick, 121 F.3d at 1201 (*relying on* Reid, 71 F.3d at 374).

The Eighth Circuit's decision in Grebenick, while not binding, is instructive.  In Grebenick, the applicant's MS symptoms were more specifically described and seemingly more extensive than Powell's symptoms in 1993-96.  Yet, Grebenick's application was rejected.  Grebenick was 38 when she began experiencing symptoms of MS in 1981.  Somewhat similar to Powell, Grebenick experienced problems with MS symptoms after giving birth to one of her children, but did not see a doctor until two years later.  Grebenick initially developed numbness and tingling in her feet and had

some discomfort and difficulties in walking.  Id. at 1195.  Her symptoms persisted but she did relatively well.  In 1983, she had a mildly unsteady gait and a decreased ability to perform rapid alternating movements with her feet and definite ataxia.  She had a positive Romberg's sign and hyperactive reflexes.  Grebenick had mild partial paralysis distally in both lower extremities bilaterally.  Her condition progressively declined over the years but her ability to control her symptoms fluctuated from time to time.  Id. at 1196.  She  applied for DIB on December 3, 1992, and alleged she had been unable to work since May 15, 1982.  Id.  Her insured status expired on Sept. 30, 1982.  There was testimony that prior to the expiration of her insured status, Grebenick needed to take two to three hour naps because of fatigue, had difficulty eating  because of numbness in her hands, was unable to bend without falling, had to go to the emergency room because of a fall, had tingling and numbness in her hands and feet, excessive fatigue, and had to have assistance to walk.  Id. at 1197.  Moreover, Grebenick's treating physician submitted a letter, dated in 1994, outlining her history and specifically concluding that she was disabled from working due to her MS prior to the expiration of her insured status.  Id.  Nonetheless, the Court concluded that the applicant was not entitled to benefits and that the ALJ was not required to use a medical advisor.

The Eighth Circuit, in Grebenick, reasoned that the physician's opinions had to be discounted because his retrospective conclusion was inconsistent with his contemporaneous progress notes.  Id.  Other witness' testimony also was discounted because the testimony was inconsistent with the objective medical evidence.  In addition, the Court concluded that there was no need to call a medical advisor under SSR 83-20 because the medical evidence was unambiguous.  Id. at 1201.  "[T]he medical records of 1983 and 1984 indicate that Grebenick's symptoms had not yet reached the disabling level of severity . . ." at least for purposes of the Listing criteria.  Id.

22

Here, with respect Powell's alleged mental impairment from the 1993 date of onset to March 31, 1996, the medical evidence is unambiguous.  Unlike Grebenick, there actually are more, *albeit* few, medical records <u>during</u> the pertinent time frame.  The records, as discussed above, do not support a finding of significant depression or anxiety, sufficient to impact Powell's ability to perform work-related activities at that time.  It also does not appear from the administrative record that additional relevant medical evidence was available.  While it sometimes may be necessary to explore other sources of documentation, here, the claimant's mother and father-in-law supplied written statements that are a part of the record.  [Tr. at 94, 95.]  Powell's mother's statement includes observations of her daughter's depression but does not provide any convincing evidence of the dates of that depression.  In fact, her mother discusses an onset date of 1989, which is inconsistent with the medical record.  The father-in-law's statement is similarly unhelpful with respect to dates.  *See* <u>Grebenick</u>, 121 F.3d at 1199 (ALJ is free to disbelieve lay witness testimony particularly in view of inconsistencies with the record).

Moreover, Powell's treating physician did not indicate that Powell was unable to work then due to physical or mental limitations.  Instead, Dr. Seelinger noted that Powell elected  to stay at home, and was very content with that decision.  Thus, this Court concludes that the ALJ did not commit error in electing not to call a medical advisor in this matter.

### C.    Consultative Psychiatric Examination

Powell also argues that the ALJ failed to adequately develop the record by not ordering a consultative psychiatric examination.  Despite a plaintiff's overall burden of proving she is disabled, the ALJ's responsibility in the nonadversarial social security setting may require the ALJ to order a consultative examination. *See* <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1166 (10th Cir.1997).  However,

the Commissioner is given broad latitude in deciding whether to order such an examination.  Diaz v.

Sec'y of Health & Human Servs., 898 F.2d 774, 778 (10th Cir.1990).  Furthermore, "a retrospective

diagnosis several years after the time at issue would be of very limited utility."  Campbell v. Barnhart,

2003 WL 164798 at *3 (10th Cir. Jan. 24, 2003) (internal citation omitted).  Moreover, the ALJ's

duty is triggered only after the plaintiff has satisfied his or her burden to provide objective evidence

"sufficient to suggest a reasonable possibility that a severe impairment exists."  Hawkins, 113 F.3d

at 1167.  In deciding how much evidence is sufficient to raise the issue, "the starting place must be

the presence of some objective evidence in the record suggesting the existence of a condition which

could have a material impact on the disability decision  requiring further investigation."  Id.

Here, as discussed above, there are no clinical or objective findings to indicate that Powell was

diagnosed with major depression or anxiety during the period under consideration.  Notably, she was

not referred to, nor did she obtain mental health counseling during the pertinent time frame.  While

she was on some medication, it was not clear if she was taking Elavil/Amitriptyline for sleep problems

or depression in 1996, and/or how serious those problems were.  There are few, if any, indicators in

the medical records that she suffered from depression from 1993 through March 31, 1996.  Indeed,

the notations in some of the medical records reflect that she was doing well and feeling fairly well.

Powell did not come forward with objective medical evidence suggesting the need for a consultative

examination.  Moreover, because there was no evidence of actual mental disability in the medical

record before March 31, 1996, the ALJ did not abuse her discretion in electing not to order a

retrospective consulting examination.  *See* Campbell, 2003 WL 164798 at *3.  Under the

circumstances, substantial evidence supports the ALJ's decision not to order a consultative

examination.

## II.    APPLICATION OF GRIDS/USE OF VOCATIONAL EXPERT

The grids consider only exertional or strength impairments.  Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991).  Exclusive resort to the grids is inappropriate when evaluating nonexertional limitations, such as a severe mental impairment.  Grimiar v. Sullivan, 966 F.2d 1326, 1333 (10th Cir. 1992).  Under circumstances where there are nonexertional limitations, a vocational expert must be consulted to determine whether a significant number of jobs is available in the national/regional economies that the claimant can perform despite the impairments.  Cruse v. U.S. Dept. of HHS, 49 F.3d 614, 619 (10th Cir. 1995).   For example, if it is determined that the plaintiff has a severe mental impairment, it may follow that she cannot perform a full range of work in the sedentary category.  Tafoya v. Barnhart, CIV No. 01-489 BB/DJS (D.N.M. April 30, 2002) [Doc. 12].

On the other hand, the ALJ may apply the grids without relying on a vocational expert if the ALJ determines the claimant has no significant nonexertional impairments affecting her RFC.  Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995); Thompson, 987 F.2d at 1488.  Here, as discussed above, Powell had no significant nonexertional impairments during the pertinent time frame, and therefore, the ALJ's application of the grids at step 5 of the analysis, without the use of vocational expert testimony, was proper.  Moreover, Judge Connor carefully determined that Powell was able to perform the demands of a full range of sedentary work during the period under consideration and that the existence of occupations in the national economy was met.  [Tr. at 15, 16.]

## III.   CREDIBILITY FINDINGS

Powell contends that Judge Connor erred in her credibility assessments, provided contradictory credibility evaluations, and/or did not follow SSR 96-7p -- all in relation to Powell's

alleged mental impairments.  Credibility determinations, in particular, reside in the domain of the finder of fact, and the ALJ's findings are afforded deference as a result.  *See* McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002).  As trier of fact, the ALJ is the individual optimally positioned to observe and assess witness credibility.  Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991).  Great deference should be given to the ALJ's conclusion as to credibility.  Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).  Nonetheless, the ALJ is required to articulate specific reasons for a negative credibility determination.  *See* McGoffin, 288 F.3d at 1254.

Judge Connor stated in her opinion that she found Powell's testimony to be "essentially credible" but that the testimony did not provide much information from which to infer that she was disabled for any consecutive 12-month period prior to March 31, 1996.  [Tr. at 15.]  In her listed Findings, the ALJ further stated that she found Powell's allegations regarding her limitations "not totally credible" as to her claimed disability before March 31, 1996.  [Tr. at 17.]  Contrary to Powell's assertions, this Court does not conclude that the ALJ's credibility findings were inconsistent with one another or unsupported.

The ALJ carefully discussed the record evidence in the context of her credibility findings, noting that while Powell testified in 2000 about feeling depressed before March 31, 1996, there was no objective clinical proof of depression or a diagnosis of a significant mental impairment during that time period.  [Tr. at 15.]  Moreover, notwithstanding the consultants' evaluations that Powell had the RFC for light work, as opposed to the ultimate finding of sedentary work, the ALJ believed (based on the testimony and evidence) that Powell might have been unable to meet the requirements of light work.  Thus, Judge Connor ultimately decided that Powell had the RFC for only sedentary work and, in so doing, appears to have found much of her testimony credible.

26

In addition, the Court does not find any error by ALJ in following SSR 96-7p which requires that the ALJ consider the entire case record and support the reasons for credibility findings with record evidence.  Here, the ALJ discussed the record and Powell's testimony in reaching her credibility determinations.  While Judge Connor did not discuss Powell's family member's written statements, that does not mean they were not considered by the Court.  *See* <u>Clifton</u>, 79 F.3d at 1009-1010 (ALJ need not discuss every piece of evidence in the record).

This Court concludes that in discussing the medical record along with Powell's testimony at the hearing, the ALJ properly articulated the reasons for her negative credibility findings, to the extent that they were negative.  Therefore, the Court will defer to the ALJ's credibility findings.

## <u>Recommended Disposition</u>

That Powell's motion to reverse and remand [doc. 9] be DENIED and that the matter be dismissed, with prejudice.

Lorenzo F. Garcia
United States Magistrate Judge